**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1157
_____

UNITED STATES OF AMERICA

v.

JOEL LEE QUENTIN SCOTT,
Appellant
_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No. 2-17-cr-00151-001)
District Judge: Hon. J. Curtis Joyner
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
December 14, 2018
_____

Before: SMITH, *Chief Judge*, McKEE and FISHER, *Circuit Judges*.

(Opinion filed: June 25, 2019)

_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

McKEE, *Circuit Judge.*

A grand jury indicted Joel Scott for armed bank robbery, in violation of 18 U.S.C. § 2113(d), and using, carrying, and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1). Scott entered a conditional guilty plea to preserve his right to appeal the District Court's denial of his suppression motions. The District Court never made any findings of fact to explain its reasons for denying the suppression motions even though the testimony the government offered at the suppression hearing was inconsistent. Given that inconsistent and contradictory testimony, the District Court's failure to make findings of fact has resulted in a record that is insufficient for us to decide the legal issues presented in this appeal. Accordingly, we will vacate and remand the matter with instructions for the District Court to make specific written findings of fact and conclusions of law.

## I.

Three police officers testified at the suppression hearing. The discrepancies in their testimony is troubling and the differing accounts were never resolved by the District Court. One of the officers, Corporal Sean Dougherty, testified that he stopped Scott and his codefendant in a residential development near the bank because they acted suspiciously by changing their direction after noticing him. However, Corporal Dougherty also testified that he thought the men were acting suspiciously because when he approached "they continued to walk [normally] and ignore[d] my presence."[1]

---

[1] App. 113.

For reasons known only to the government, Sergeant Louis Montalbano, the officer who initially seized the cash from Scott's pockets, was not called to testify. The testimony surrounding his search of Scott and resulting seizure is inconsistent. It is not clear whether Sergeant Montalbano "saw" or "felt" the cash which led to the challenged seizure and subsequent arrest. According to the government's response to Scott's motion, officers discovered the cash during a patdown for weapons and therefore had the authority to seize it under the "plain feel" doctrine. Yet, Corporal Dougherty recalled, Sergeant Montalbano "could actually see some cash, a wad of cash in [Scott's] front right pocket."[2] If that were the case, the District Court may have concluded that the officer could seize the money under the "plain view" doctrine.[3]

However, Corporal Dougherty further testified that he took over the patdown and "could feel a considerable amount of cash in [Scott's] pocket."[4] After removing the cash from Scott's front right pocket, Corporal Dougherty testified, "I could feel another significant lump in his [front left] pocket that was consistent with cash."[5] On cross-examination, Corporal Dougherty was asked about the encounter as viewed from the dash cam video. This followed:

> **Q.** Where we see you there manipulating what was in his pockets?
> **A.** Feeling his pockets.
> **Q.** Okay. So at that point, you knew whatever was in his pockets was not a weapon, correct?
> **A.** Well, I didn't know what was behind the big wad of cash. There could have been a small knife. So I was making sure, 1, that it was a wad of cash; and, 2,

---

[2] App. 119–20.
[3] *See Minnesota v. Dickerson*, 508 U.S. 366, 374 (1993).
[4] App. 120.
[5] App. 120–21.

there was nothing that could poke me as I go and get it.
**Q.** Okay. But you were squeezing it, correct?
**A.** Yes, I would say that I was.[6]

Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant."[7]  "The rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment[.]"[8]  Nevertheless, the plain view doctrine cannot justify a seizure if "the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object—*i.e.*, if its incriminating character is not immediately apparent."[9]  Here, there is at least some evidence to cast doubt on whether Sergeant Montalbano actually "saw" the cash in Scott's pocket.  For example, in the dash cam video, Scott is wearing an untucked shirt that may have been covering his pockets.  If the officers had to lift Scott's shirt to observe his pockets and see the cash, it may not fall within the purview of the plain view doctrine.  Moreover, cash hanging from one's pocket is not *per se* incriminating.[10]

---

[6] App. 180.
[7] *Dickerson*, 508 U.S. at 375.
[8] *Id.*
[9] *United States v. Yamba*, 506 F.3d 251, 257–58 (3rd Cir. 2007) (quoting *Dickerson*, 508 U.S. at 375).
[10] *See United State v. Sokolow*, 490 U.S. 1, 8 (1989) (noting that carrying large amounts of cash "is not by itself proof of any illegal conduct"); *United States v. Berenguer*, 562 F.2d 206, 210 (2d Cir. 1977) (billfold containing $3,200 "offered no immediately apparent"

4

The "plain feel" doctrine derives from plain view.[11] Under plain feel, "officers may seize nonthreatening contraband detected during a protective patdown search."[12] But like the plain view doctrine, the contraband must be "immediately apparent" to justify seizure under plain feel.[13] Here, Corporal Dougherty's own testimony confirms that he did squeeze and manipulate Scott's pockets when detecting the cash. Thus, if "the officer[s] determined that the lump was contraband only after squeezing, sliding, and otherwise manipulating the contents of [Scott's] pocket—a pocket which the officer already knew contained no weapon,"[14] that would contradict any notion that they immediately recognized the lump as "a wad of cash,"[15] and the seizure would not be covered by the plain feel doctrine. Absent any findings, we are left guessing about the immediacy, certainty, and amount of manipulation used to acquire knowledge about the cash seized.[16]

The bank manager was also not called to testify. However, Detective Stephen Brookes testified that the bank manager was able to identify Scott because he "was wearing black pants, and she recognized his build."[17] Detective Brookes later stated that

---

inculpatory evidence); *see also United States v. $121,100.00 in U.S. Currency*, 999 F.2d 1503, 1506 (11th Cir. 1993) (in forfeiture proceeding, holding that, "[a]bsent some evidence," large sums of money provide "no reasonable basis for believing that the money is substantially linked to" illegal conduct).

[11] *Yamba*, 506 F.3d at 257.

[12] *Id.* (quoting *Dickerson*, 508 U.S. at 373).

[13] *Id.* at 257–60.

[14] *Yamba*, 506 F.3d at 258 (quoting *Dickerson*, 508 U.S. at 378); *see* App. 180.

[15] App. 119–20.

[16] *See Yamba*, 506 F.3d at 259.

[17] App. 293.

the bank manager was able to identify Scott because he was the shorter of the two men arrested. But when asked whether the manager said "anything particular about [Scott's] build," Detective Brookes stated "no, not that I recall."[18] The manager had not seen the robbers' faces during the robbery, both Scott and his codefendant were wearing dark pants when they were arrested and identified, and both Scott and his codefendant are black males. Scott argues that by "build" the manager simply meant that Scott was the shorter of the two men arrested and presented to her. He argues that he was therefore not actually "identified." He also claims that the manner in which the police conducted the showup, was unduly suggestive and constituted a denial of due process.

After the hearing, the District Court took the matter under advisement. A month later, the Court entered summary orders denying Scott's suppression motions without making any findings of fact or conclusions of law. The Court's orders contained a footnote stating: "The Court will further supplement the record of this case with Findings of Fact and Conclusions of Law at a later date so not to delay the Defendant and the Government in preparing for trial."[19] Despite this statement, the District Court did not issue any written findings of fact or conclusions of law.

Subsequently, Scott entered a negotiated conditional guilty plea which preserved his right to appeal the denial of his suppression motions. This appeal followed.

---

[18] App. 294.
[19] App. 3 n.1; App. 4 n.2.

## II. [20]

A district court judge is not required to make formal written findings of fact.[21] However, "[w]hen factual issues are involved in deciding a motion, [a district] court must state its essential findings on the record."[22] When the district court makes no written findings of fact, "we must extract findings from his [or her] oral decision at the hearing."[23]

In the instant case, not only did the District Court fail to make written findings of fact, it also did not make an "oral decision at the hearing."[24] Rather, the Court stated the following at the conclusion of the suppression hearing:

> Counsel, I'll take this matter under advisement. . . I will issue an order. I might file subsequent findings of fact and conclusions of law in reference to the order. The order will come first initially, and then I'll put findings of fact and conclusions of law on the record to support that decision.[25]

As is evident from our brief discussion of the plain view (and plain feel) doctrine, the Court's ruling on Scott's suppression motions cannot be reviewed without knowing the precise circumstances that surround the seizure of evidence from his pocket including the timing and sequence of those events. That, in turn, can only be determined if we know what testimony (if any) the Court found credible. In the absence of testimony by Sergeant

---

[20] The District Court had subject matter jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291. We review the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and we exercise plenary review of the District Court's application of law to those facts. *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

[21] *See In re Application of Adan*, 437 F.3d 381, 387 (3d Cir.2006).

[22] Fed.R.Crim.P. 12(d).

[23] *In re Application of Adan*, 437 F.3d at 396.

[24] *See id.*

[25] App. 366.

Montalbano and the bank manager, we can only speculate about what the District Court believed happened after the police arrived.

Accordingly, remand is appropriate.

## III.

For the foregoing reasons, we will vacate the orders denying Scott's motions to suppress and remand the case to the District Court to make findings of fact resolving the troubling contradictions in these testimonies.